Filed 12/2/13  In re I.F. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re I.F., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> I.F., <br><br> Defendant and Appellant. | F065385 <br><br> (Super. Ct. No. 512523) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Nan Cohan Jacobs, Judge.

Gabriel C. Vivas, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and John G. McLean, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## *INTRODUCTION*

In February 2012, a juvenile delinquency petition was filed alleging that appellant I.F. committed assault likely to produce great bodily injury based on an incident in juvenile hall. (Welf. & Inst. Code, § 602, subd. (a); Pen. Code, § 245, subd. (a)(4).) After a contested jurisdictional hearing in May 2012, the allegation was found true. In July 2012, the juvenile court declared the offense to be a felony, adjudged I.F. to be a ward of the court, and ordered him committed to the Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ), for a term of 16 months. Combined with the terms for his previously sustained petitions, I.F.'s maximum period of confinement was eight years eight months.

On appeal, I.F. contends that (1) juvenile hall staff violated his right to equal protection by withholding medication prescribed for the treatment of his Attention Deficit Hyperactivity Disorder (ADHD); (2) he received ineffective assistance of counsel when defense counsel failed to investigate or present any evidence regarding his ADHD and the withholding of medication in his defense at the jurisdictional hearing; (3) the juvenile court failed to comply with California Rules of Court, rule 5.651 (hereafter rule 5.651); and (4) the cumulative impact of these errors deprived him of his right to due process and a fair trial. We find I.F.'s contentions unpersuasive and will affirm the juvenile court's adjudication and orders.

## *FACTS*

### 1. *Jurisdictional hearing*

#### a. *Prosecution evidence*

On February 5, 2012, while minors in juvenile hall were lining up for lunch, I.F. jumped out of line and began striking C.M. rapidly in the face and head. I.F. struck C.M. between 8 and 10 times, inflicting a gash above C.M.'s right eye. C.M. did not fight back but tried to block his face.

Correctional Officer Valdemar Cadena gave a "cover command" and the other minors got down on the ground. I.F. continued trying to hit C.M. until Correctional Officer Raffie Gharibian subdued I.F. with pepper spray. Cadena guided I.F. down to the ground and placed him in handcuffs. Gharibian heard I.F. say, in a loud voice, "Fuck all scraps." Cadena did not hear I.F. make this statement.

### b. *Defense evidence*

I.F. admitted striking C.M. 8 to 10 times. When asked why, I.F. explained it started the night before the incident when he called his mother and learned that she and his little sisters had gotten into a car accident. This made I.F. mad, sad, and worried. Then, the day of the incident, C.M. made verbal threats, saying he was going to kill I.F. and his family. C.M. also made visual threats, throwing punches in the air and pointing at I.F. Even though officers were present, I.F. felt threatened when he and the other minors were lined up in the hallway. He thought C.M. was going to attack him when they went to get their meal.

On cross-examination, I.F. admitted he was a Norteño gang member. He denied attacking C.M. because he was a Sureño gang member. According to I.F., C.M.'s gang affiliation had nothing to do with the attack. I.F. attacked C.M. because of the threats C.M. made. I.F. believed C.M. intended to carry out his threats. I.F. did not report the threats to juvenile hall staff because he knew he could handle it himself. He intended to continue hitting C.M. until he "knew he had enough."

### c. *Juvenile court ruling and discussion of I.F.'s ADHD*

After listening to closing argument, the juvenile court found true the allegation that I.F. committed assault likely to produce great bodily injury and reserved a ruling on a felony or misdemeanor disposition to the time of the dispositional hearing. The following are some of the comments the court made in explaining its true finding on the assault allegation:

3.

"So the issue in this case is:  Did [I.F.] act intentionally and willfully and apply force that was likely to produce great bodily injury?…

"The injury sustained by [C.M.] in and of itself was not a serious injury.…

"However, that's not the key.  The issue is whether the force that was exercised by the minor was likely to cause great bodily injury.

"And after considering all the evidence, particularly, [I.F.], listening to your testimony, I find that it was.  One of the facts that particularly persuaded me was your comment that your intent was to hit him until he had had enough.  You intended to beat this young man into submission.  And that is particularly chilling.

"As to the self-defense argument, I also looked at the CALCRIM instructions on self-defense to see if that would possibly justify the conduct.  And in that regard, I looked at CALCRIM [No.] 3470 and 3471.  [¶] … [¶]

"Under the circumstances, I find it hard to believe that the threat, even if I believe you, [I.F.], that [C.M.] had made verbal threats to you and your family and that he had been basically shadow boxing across the unit.…

"Even if I believe that to be true, nevertheless, I have to find that the threat was imminent.  When you were going to lunch, there has to have been an imminent threat that you were going to be harmed.  I have not heard any testimony from anyone that there was any imminent threat of harm to you at that point in time.

"And when we heard the testimony from both the witnesses, both the correctional officers in the Hall, that [C.M.] did not take any defensive measures whatsoever.  He just took it.  And that you punched him by all three [ac]counts eight to ten times in rapid succession.

"Also under CALCRIM [No.] 3471, it talks about the right to self-defense in cases of mutual combat or initial aggressor.  So, for instance, it's not disputed that you were the initial aggressor here.

"In order to invoke, successfully invoke self-defense, the evidence has to show that you actually and in good faith tried to stop fighting and indicated by word or conduct in a way that a reasonable person would understand that you wanted to stop fighting.  So, basically, you'd have to say Stop, I'm done.  That never happened.  [C.M.] never put up any defense whatsoever.

4.

"So after reviewing the law and considering the evidence, I'm particularly disturbed about the comments by the one witness that he overheard the comment—let me find it in my notes. This was from Mr. Gharibian where he said, he heard you say in a loud voice, 'Fuck all scraps.' And that is a direct quote.

"It appears to me that this was a gang-related incident provoked by gang tension. And that in and of itself I think shows that this was not a self-defense. But even if I ignore that, even if those comments had not been made, the elements of self-defense have not been satisfied."

After the juvenile court made its ruling, defense counsel raised the issue of I.F.'s ADHD, resulting in this discussion:

"[DEFENSE COUNSEL]: … One thing I want to make sure that the Court understands, and I have not introduced this up until now, specifically, because I have considered this to be a mitigating factor.

"My client has a diagnosis, according to his family as well as from medical records that I do have, of ADHD of a substantial nature. And, obviously, impulsivity is one of the sidebars of ADHD, and I do have some records.

"I would almost like to make sure that the probation officer, who is handling this report, is at least aware of this diagnosis. I know the mother is most certainly prepared to attest to it, and I can, in fact, send his diagnostic materials or at least these materials that I have to the Probation Department. I will also send a copy to the D.A., if that is appropriate.

"THE COURT: Certainly that is a factor we can consider.

"[THE PROSECUTOR]: The Court knows my feelings about it.

"THE COURT: And I know I have expressed my feelings on mental health issues. I don't know about the extent of [I.F.'s] disability from ADHD.

"My general feeling, [defense counsel], is that we can't allow kids to use mental health issues as an excuse to justify breaking the law or bad behavior.

"[DEFENSE COUNSEL]: Oh, I concur with you, your Honor.

"THE COURT: And I understand that sometimes their impulsivity makes it more difficult for them to comply with the rules that society

5.

imposes.  But the rules don't go away.  And the law doesn't say that you cannot assault someone and that your assaults can be excused if you have ADHD.

"[DEFENSE COUNSEL]:  I understand, your Honor.  But one of the things is that there are situations like [I.F.'s] and this is where, I think, our records will probably end up showing, is that the—my client when he is in a more difficult situation with the ADHD.  He is not getting his medical assistance that he requires.  It's my belief, based upon my discussions with his mother, he was not receiving appropriate medication for ADHD until just recently until she submitted several requests that he, in fact, receive those medications.

"So this is just—and I appreciate that it is not a defense, your Honor.  Again, I'm not saying it is a defense, but sometimes there are mitigating factors.

"THE COURT:  And I can consider that."

## 2.  *Dispositional hearing*

### a.  *Probation officer's report/dispositional social study*

As pertinent to the issues raised in this appeal, the probation officer reported that I.F. (born April 1994) was a special education student and had been in juvenile hall the majority of the past school year.

The probation officer further reported that I.F.'s mother, C.P. (mother), had provided additional information she wanted included in I.F.'s dispositional report for the juvenile court's review.  Specifically, she provided documents from Golden Valley Health Center, indicating I.F. was diagnosed with ADHD and had been under a doctor's care since October 8, 2010.  I.F. had been treated with 15 milligrams of Adderall XR and was supposed to take the medication daily.

The probation officer attached to the report a letter written by mother addressing the juvenile court.  According to the letter, when mother received a "booking call" from juvenile hall staff on January 30, 2012, she informed them that I.F. was currently on two different medications for ADHD and anxiety.  When she visited I.F. on February 1, 2012, mother asked him if they were already giving him his medications and he said no.

The next day, mother contacted the psychiatric nurse in juvenile hall and asked why they were still not giving I.F. his medications. The nurse said she would check his file and "realized" that I.F. was supposed to be on medication. Mother assumed they were going to start giving it to him. Then the February 5th incident happened, and mother "had a feeling they were still not giving him the medication …."

Mother waited to visit I.F. again and asked him at the visit whether he was taking his medication. When I.F. said no, mother became upset and called the nurse again. Mother explained what happened and told the nurse that if they had given I.F. his medication, "none of this would of happened …."

The psychiatrist called mother the next day to get her "ok" to start I.F. on his ADHD medication. According to mother, they did not start I.F. on his ADHD medication until mid-March, and they did not start him on anxiety medication until May 2, 2012.

Mother wanted the court to know that, without his medication, I.F. was "like a firecracker" and unable to "function."

### b. *Mother's testimony*

At the dispositional hearing, mother testified regarding the circumstances she described in her letter. According to her testimony, when I.F. was arrested and brought into juvenile hall, she notified staff that I.F. had a diagnosis of ADHD and required medications, specifically 20 milligrams of Adderall for ADHD and 50 milligrams of Zoloft for anxiety.

On her first visit, mother asked I.F. if he was getting his medication and he said no. On her way out, she visited the nurse and continued to follow up with three or four calls before the February 5 incident occurred.

After the incident, mother came in herself and spoke with the nurse about I.F.'s need for medication. The nurse said she could not "ok" it and that she would talk to the psychiatrist, who was the only one who could. The nurse apologized that they did not

give I.F. his medications, noting their records indicated they had given him his medications in the past.

Although I.F. was 18, mother thought I.F. was eligible to finish high school as a special education student, noting that he had an individualized education program (IEP). At this point, the juvenile court interjected:

> "THE COURT: While we're on that subject, [probation officer], does [I.F.] have a current IEP?

> "THE PROBATION OFFICER: Your Honor, I contacted Juvenile Hall this morning to find out about that. For some reason he's not in special ed here in Juvenile Hall. Why, I have no idea.

> "According to [mother], she went, which this—the letter that was completed for the IEP was done in April of 2012 when he was in custody. And at that time they did say he didn't qualify. But in the notes, and … according to [mother] it was basically because he wasn't able to be present. So they couldn't really make a decision on if he should continue or not.

> "THE COURT: Okay. We can do an IEP[] in Juvenile Hall.

> "THE PROBATION OFFICER: Yes. I don't know why. I contacted the teacher down there, and they told me he was not in Special Ed."

### c.    *Juvenile court's ruling*

Following closing argument, the juvenile court denied I.F.'s motion under Penal Code section 17, subdivision (b), to treat the assault as a misdemeanor and ordered I.F. committed to the DJJ. In support of its order, the court made a number of comments, including these:

> "Let me start with [defense counsel's] description of the [DJJ].

> "No. 1, the [DJJ] is not, so to speak, on trial here. It is not a perfect system. I agree with you. I wish they could do more for kids than they do. But as a practical matter, they provide a lot more services at DJJ than we can right now in Juvenile Hall.

8.

"We have two mental health counselors. As of today, I think there were 133 kids in the Hall. 133 kids, almost all of whom have some form of mental health needs or another. We simply can't provide much in the way of services. [¶] … [¶]

"Let me just cut to the chase. I am going to order a commitment to the [DJJ].

"Looking at your history, it's really pretty appalling. The best thing you had in your favor was that you didn't get in trouble until right before your 17th birthday, and then you just spiraled out of control.

"Your first petition was March 18th of last year. A month and a half before your 18th birthday. I know [the prosecutor] went over this. You were released from custody on April 27th; you got arrested again, May 26th; got out of custody, June 2nd; went back into custody, June 30th, on a probation violation; you were there till July 11th; three weeks later you are back again with another probation violation. You did another couple of weeks. You got out on the 21st. Back into custody eight days later. And on and on it continues. You have never been out, I don't think even a month in a year—in over a year. And that is terribly concerning. [¶] … [¶]

"One of the things that is I remember that struck me the most, and I commented on this at your jurisdictional hearing.… The comment I made was the testimony. You testified, and one of the questions was: How long did you plan on hitting the victim? And because you kept on hitting the victim even after you had been pepper sprayed by Juvenile Hall staff. And your response was, you were going to hit him until he had enough.

"This was not an ADD incident or anxiety incident. This was an act of gang retaliation pure and simple. You made derogatory gang remarks during the assault. Your history has been consistent with that.…

"And when I see someone who is so severely gang entrenched and so violent—this was a totally unprovoked attack. And even though Juvenile Hall staff tried to get you under control, nothing worked, and you just kept on punching. There is no excuse for that kind of behavior.

"Why you didn't get your medication in Juvenile Hall, I don't know. If there was prescribed medication, it was prescribed on the outside of the bottles for the family to bring it in on the bottles. That didn't happen. I don't know why. I don't know why you didn't get your medicine, why there wasn't a request for a psychiatric exam. According to your mother's

testimony, she requested it.  But be that as it may, it does not excuse what you did.

"Probably the majority of the kids in Juvenile Hall have ADD or some other type of mental health issue, I have no doubt, and I know the studies show that the vast majority of kids that go through the juvenile system have health disorders of one sort or another.

"I can't excuse violent behavior on mental health issues.  Nobody told you—no mental disorder gives you the right to beat somebody bloody like you did as shown in those pictures.  It's just inexcusable."

## *DISCUSSION*

### I. *Equal protection*

I.F. first contends his right to equal protection was violated because he was treated differently than special education students in other settings when juvenile hall staff intentionally "withheld" medication prescribed for the treatment of his ADHD.  We reject I.F.'s contention because he has failed to demonstrate an equal protection violation under any of the authorities he cites.

Both the federal equal protection clause (U.S. Const., 14th Amend.) and its California counterpart (Cal. Const., art. I, § 7, subd. (a)) require that persons similarly situated with respect to the legitimate purpose of a law must be treated alike under the law.  (*Cleburne v. Cleburne Living Center, Inc.* (1985) 473 U.S. 432, 439; *Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 857.)  The constitutional right to equal protection applies not only to groups, but to individuals who constitute a "'class of one'" (*Village of Willowbrook v. Olech* (2000) 528 U.S. 562, 564) if the individual "has been intentionally treated differently from others similarly situated and … there is no rational basis for the difference in treatment."  (*Ibid.*)

To prove a class-of-one claim under the federal or state Constitution, it must be established that the treatment complained of was different from the treatment of others similarly situated, that the unequal treatment was intentional, and that the unequal

treatment was not rationally related to a legitimate governmental purpose. (*Syngenta Crop Protection, Inc. v. Helliker* (2006) 138 Cal.App.4th 1135, 1174.)

I.F.'s equal protection claim fails because there is no evidence the failure to provide him with his ADHD medication was intentional or purposeful. I.F.'s assertions in this regard are speculative and unsupported by the record. For example, he asserts it is "most reasonable to infer from staff's inattention that each of those staff persons responsible for providing [I.F.'s] medications had choices or priorities to choose and on each occasion … providing [I.F.'s] medications took a second seat to another task" and "[i]t is also likely that there was a domino effect where one person's decision subsequently affected the judgment of a colleague who went along with the first officer's decision to withhold medication."

Not only is there no evidence that any juvenile hall staff member made a deliberate decision to withhold I.F.'s ADHD medication, his argument assumes, without any factual support, that multiple staff members had the ability or authority to provide him his medication and each made a conscious choice to withhold his medicine thereby influencing one another. However, the record indicates that the number of personnel who were authorized to approve mother's request for medication was very limited. According to mother's account, when she complained about I.F. not receiving his medication after the subject assault, the nurse apologized and essentially informed mother that only the staff psychiatrist could approve her request for medication.[*] Mother also reported that

---

[*]This information is consistent with information the juvenile court provided at earlier proceedings. Thus, at a dispositional hearing on a different matter in May 2011, when mother raised similar concerns about I.F. not receiving his ADHD medication, the court informed mother that she either had to provide a current, written prescription for the medication, or I.F. would have to undergo an evaluation by psychiatric staff in juvenile hall before he could begin receiving ADHD medication. Because mother was apparently unable to provide a current prescription, defense counsel requested, and the court ordered, an evaluation of I.F. by psychiatric staff to determine his need for medication.

11.

the psychiatrist called her shortly after she spoke with the nurse and that I.F. started receiving his ADHD medication around mid-March 2012.

There is no basis in the record to conclude that I.F.'s failure to receive ADHD medication at the time his mother requested was the result of, in I.F.'s words, a "purposeful denial of medical treatment ...." We can just as easily postulate that the failure was due to an inadvertent delay in the handling of her request, a theory which finds support in the court's comments at the dispositional hearing acknowledging the limited resources available in juvenile hall for meeting the mental health needs of its residents.

*Estelle v. Gamble* (1976) 429 U.S. 97, which held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' [citation], proscribed by the Eighth Amendment" (*id.* at p. 104), provides no legal support for I.F.'s equal protection claim under the Fourteenth Amendment. It is also factually inapposite. For reasons just discussed, there is no evidence supporting I.F.'s assertions that juvenile hall staff either intentionally withheld his ADHD medication or acted with deliberate indifference to his medical needs. (See *Estelle v. Gamble*, *supra*, at pp. 105-106 [deliberate indifference not shown by mere negligence or inadvertence]; *Farmer v. Brennan* (1994) 511 U.S. 825, 836-840 ["deliberate indifference" standard includes subjective element that defendant knows of and disregards excessive risk to inmate health or safety].)

## II.    *Ineffective assistance of counsel*

Next, I.F. contends he received ineffective assistance of counsel when his defense counsel failed to investigate or present any evidence regarding I.F.'s ADHD and the withholding of medication in his defense at the jurisdictional hearing. We disagree.

The defendant has the burden of proving ineffective assistance of trial counsel. To prevail on a claim of ineffective assistance of trial counsel, the defendant must establish not only deficient performance, which is performance below an objective standard of

12.

reasonableness, but also prejudice. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Tactical errors are generally not deemed reversible. Counsel's decisionmaking is evaluated in the context of the available facts. To the extent the record fails to disclose why counsel acted or failed to act in the manner challenged, appellate courts will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. Prejudice must be affirmatively proved. The record must affirmatively demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*People v. Maury* (2003) 30 Cal.4th 342, 389.) Attorneys are not expected to engage in tactics or to file motions which are futile. (*Id.* at p. 390; also see *People v. Mendoza* (2000) 24 Cal.4th 130, 166.)

Regarding defense counsel's performance, I.F. complains there is "no evidence that shows counsel even considered, let alone made any effort, to show that [I.F.'s] assaultive conduct may well have been a manifestation of a symptom of ADHD." However, there is no evidence defense counsel did *not* consider the role I.F.'s untreated ADHD might have played in the assault.[†] Instead, the record contains evidence that defense counsel was well aware of I.F.'s ADHD, contradicting I.F.'s assertions that defense counsel likely failed to educate himself about his diagnosis.

---

[†]I.F. suggests that defense counsel's failure to consider the role I.F.'s ADHD might have played in the subject incident is demonstrated by comments counsel made at the beginning of the jurisdictional hearing. According to I.F., "counsel made a point of disclosing he had not reviewed [I.F.'s] 'medical records' that he expected would be offered by the prosecution because, he said, he had just finished another trial." A careful review of defense counsel's comments reveals he was referring not to *I.F.'s* medical records, but to the *victim's* medical records. Therefore, defense counsel's comments do not indicate any lack of knowledge or consideration of I.F.'s ADHD diagnosis.

13.

For example, at a dispositional hearing in April 2011 regarding I.F.'s previously sustained petition for first degree burglary, defense counsel argued that I.F.'s unmedicated ADHD likely contributed to his participation in a recent incident of violence in juvenile hall, which was a factor the juvenile court was considering in determining whether or not to grant I.F. deferred entry of judgment (DEJ). Defense counsel specifically argued that I.F.'s conduct during the incident reflected "almost classic ADHD behavior patterns." The prosecutor, who was the same prosecutor in the instant case, opposed defense counsel's request for DEJ, strongly objecting to his reliance on I.F.'s ADHD as a mitigating factor. Among other things, the prosecutor stated he found it "disturbing" when "people use the condition of ADHD as a crutch and excuse their poor behavior on the condition or lack of medicine." While granting I.F. DEJ and placing him on house arrest, the juvenile court judge, who was also the same judge in the instant case, expressed agreement with the prosecutor, explaining:

> "I do have to agree with [the prosecutor], and I have said that precise thing that he has said, perhaps not with as much passion as he said it this morning, but I have said the exact same thing that mental health issues, whether they are ADHD or bipolar disorder or anxiety disorder or any other form of mental health issue, does not excuse poor behavior. It does not.

> "I understand that—I'm well aware that ADHD can make you more impulsive, but that's something you need to learn to live with. I am very concerned because it was a gang-related disturbance. And we had—that particular day, it appears that it was a general free-for-all in Juvenile Hall, and that's not a good thing. The entire unit was affected. And a lot of reshuffling kids from one unit to another had to occur, and it was not a good thing."

Given that defense counsel was facing the same judge and prosecutor in the instant case, and his awareness of their potential reaction, defense counsel could have made a reasonable tactical decision not to present evidence of I.F.'s ADHD in his defense at the jurisdictional hearing and to pursue a self-defense theory instead. On the record before us, we cannot agree with I.F.'s assertion that the only reasonable explanation for

14.

counsel's failure to present evidence of his ADHD diagnosis was that "counsel was unaware of the IDEA [Individuals with Disabilities Education Act], California's corresponding laws, and of the significance of medication for an ADHD patient." The record simply does not support I.F.'s assertions regarding defense counsel's alleged lack of knowledge concerning his ADHD diagnosis.

I.F. has also failed to show he was prejudiced by his counsel's allegedly deficient performance. I.F. argues that, had defense counsel "explored and educated himself on his client's diagnosis, or had the defense brought an expert witness in as part of the defense, an argument could have been mounted to show that [I.F.'s ] behavior was consistent with commonly known classic symptoms of ADHD." According to I.F., "[i]t is impossible to say that a different conclusion by the juvenile court may not have resulted since [I.F.'s] intent to cause great bodily harm was not necessarily present because of his uncontrollable impulsivity associated with denial of his medication."

In our view, it is unlikely the juvenile court would have found I.F. lacked the requisite intent for the assault charge if defense counsel had presented evidence that I.F.'s behavior during the February 5, 2012, incident was consistent with the symptoms of ADHD. As the juvenile court stressed at both the jurisdictional and dispositional hearings, I.F.'s testimony that he intended to hit the victim until he knew the victim had "had enough" was powerful evidence his application of force on the victim was intentional and willful and not the result of an uncontrollable impulse. The court also stressed that I.F.'s derogatory gang remark showed the attack was gang-related. And the court specifically remarked that "[t]his was not an ADD incident or anxiety incident. This was an act of gang retaliation pure and simple." In light of the court's comments and strong evidence of I.F.'s intent, it is not reasonably probable the result of the proceedings would have been different had defense counsel presented evidence of I.F.'s ADHD in his defense at the jurisdictional hearing.

## III.    Rule 5.651

I.F. further contends the juvenile court abused its discretion by failing to comply with rule 5.651 by not completing a Judicial Council Forms, form JV-535. We disagree and conclude the court made proper findings regarding I.F.'s educational needs.‡

"A juvenile court's commitment order may be reversed on appeal only upon a showing the court abused its discretion. [Citation.] '"We must indulge all reasonable inferences to support the decision of the juvenile court .…"'" (*In re Robert H.* (2002) 96 Cal.App.4th 1317, 1329-1330.)

"Education Code section 56000 declares that 'all individuals with exceptional needs have a right to participate in free appropriate public education .…' 'Individuals with exceptional needs' includes any child who is '[i]dentified by an individualized education program [IEP] team as a child with a disability,' as defined by the Individuals with Disabilities Education Act (20 U.S.C. § 1400 et seq.) .…" (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1397, fn. omitted (*Angela M.*); Ed. Code, § 56000, subd. (a).)

The juvenile court must address and determine a child's general and special education needs, identify a plan to meet those needs, and set forth findings on a Judicial Council Form, form JV-535. (Rule 5.651(b)(2); see *Angela M.*, *supra*, 111 Cal.App.4th at p. 1398.)

*Angela M.* addressed the requirement of a juvenile court to consider a minor's educational needs. That decision found the juvenile court there abused its discretion in committing the minor to the California Youth Authority (now the DJJ) without

---

‡We summarily reject I.F.'s claim that the juvenile court interjected its own personal views on mental health issues in place of the law in making its commitment order. The court's comments throughout the proceedings, which we have set forth in great detail above, reflect not only considerable knowledge, but thoughtful application of the law in rendering its orders concerning I.F. We see no evidence of "bias" or "hostility" in any of the court's comments, including those selectively cited by I.F.

16.

mentioning the issue of educational needs, as the court was "clearly on notice that [the minor] may have special educational needs." (*Angela M.*, *supra*, 111 Cal.App.4th at pp. 1398-1399.)

The instant case is not *Angela M.* Here, the juvenile court was clearly aware of its duty to consider, and did consider, I.F.'s educational needs. The court specifically found that I.F. was an individual with special education needs and ordered the probation department to provide his IEP and documentation that he was a special education student to the appropriate authorities. In the event I.F. did not have a current IEP, the juvenile court ordered the probation department and/or the education staff at juvenile hall to evaluate I.F. for any disabilities, stressing the importance of obtaining an evaluation of I.F.'s "emotional disabilities."

We conclude the juvenile court adequately considered I.F.'s educational needs in committing him to DJJ, and the court's failure to formalize its educational findings in form JV-535 is harmless on this record.

## IV.    *Cumulative error*

In conclusion, I.F. contends the cumulative impact of all the alleged errors deprived him of his right to due process and a fair trial. Because we have rejected I.F.'s individual claims of error, his claim of cumulative error also fails.

## *DISPOSITION*

The juvenile court's adjudication and orders are affirmed.

_____

Oakley, J.[§]

WE CONCUR:

_____

Gomes, Acting P.J.

_____

Poochigian, J.

---

[§]Judge of the Superior Court of Madera County, assigned by the Chief Justice pursuant to article VI, section 6, of the California Constitution.